UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                      Case No. 5:16-CR-20196
                      Hon. Judith E. Levy

OBIOMA AGOMUOH,

    Defendant.
_____/

**United States' Response Opposing
the Defendant's Motion for Compassionate Release**

The Defendant, Obioma Agomuoh, was the key player in an opioid pill prescriptions-for-cash scheme that resulted in many thousands of pills hitting the street market. It was an enterprise that could not have run without him, because, as a physician, he was one of the primary gatekeepers that was relied upon to avoid highly addictive and often abused substances like these from being diverted from their appropriate use. The millions of dollars in cash that he generated for himself through this years' long scheme was not enough for him; he also billed Medicare for more than $1.6 million dollars for medical care that he didn't provide.

Despite having served only 9 months of a 60 month sentence, Agomuoh now seeks his immediate release based on the COVID-19 pandemic and his medical conditions that may make him more susceptible to a severe case were he to contract the virus. Agomuoh cites to issues with containing outbreaks at select institutions, such as the Riker's Island local jail, but largely ignores the significant efforts at suppression taken by the federal Bureau of Prisons, and completely ignores that, as of the date of this filing, there have been zero cases at FCI Morgantown where he is incarcerated. He also ignores that southeast Michigan is one of the country's hotbeds for community spread of COVID-19. And, he has failed completely to abide by the legal requirement of seeking administrative remedy for his request, which means that this Court cannot consider his motion.

Agomuoh's request should be denied.

## Background

Beginning in or about 2011, Dr. Agomuoh began to work with patient "recruiters," who sought out "patients" to bring to Dr. Agomuoh's medical office to obtain prescriptions for Schedule II

controlled substances, including oxycodone. The recruiters and their "patients" were not seeking medical care; they were seeking prescriptions for opioid pills that they intended to sell on the street market, and they were willing to pay for those prescriptions. The recruiters paid between $200-$300 in cash to Dr. Agomuoh to see the patients, whom he gave a cursory physical examination, or no exam at all. After this cursory exam, Dr. Agomuoh would write prescriptions to the patients for controlled substances, that were not medically necessary, and were being issued outside the course of professional medical practice and for no legitimate medical purpose. On some occasions, Dr. Agomuoh issued the prescriptions without having seen the patient at all. Over the approximately four years during which Dr. Agomuoh operated this scheme, as many as 20,000 illegitimate prescriptions were issued.

During this same time period, 2011 through 2015, Dr. Agomuoh also engaged in a scheme to obtain payments from Medicare to which he was not entitled. Dr. Agomuoh submitted bills for medical services that, in some cases, he did not provide at all, and in other cases the bills greatly overstated the type and extent of the medical care he did

provide. This scheme, too, was lucrative, resulting in more than $1.6 million of loss to the Medicare program due to the paying of fraudulent bills.

Agomuoh was prosecuted, and following a plea of guilty was eventually sentenced to 60 months' of imprisonment. Agomuoh began serving his prison sentence on June 14, 2019, and is currently incarcerated at FCI Morgantown, in West Virginia. He is 69 years old, and his projected release date is September 16, 2023. His underlying medical conditions include hyperlipidemia, diabetes, hypertension, and atherosclerosis, as well as other conditions. *See* attached Exhibit, BOP Medical Records, Pgs. 24-26 (Health Problems)(sealed). It would appear from review of the medical records that Agomuoh's health conditions are currently well managed and stable. Agomuoh has moved for compassionate release, citing his medical conditions and the COVID-19 pandemic. Agomuoh has made this request despite having made no attempt at release through the administrative process with the Bureau of Prisons.

## Argument

### I. The Court should deny Agomuoh's motion for compassionate release.

Section 603(b) of the First Step Act of 2018 amended 18 U.S.C. § 3582 to afford inmates the right to seek compassionate release on their own motion, when previously only the Bureau of Prisons' Director could do so. But first, inmates must request compassionate release and exhaust their administrative remedies with the Bureau of Prisons, or wait 30 days in the event the Bureau of Prisons fails to act on their request. 18 U.S.C. § 3582(c)(1)(A). Second, a court may only grant compassionate release based on an individual inmate's "extraordinary and compelling reasons," which must be consistent with the Sentencing Commission's policy statement and which the inmate has the burden of showing. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13(1)(A), (3); *United States v. Hamilton*, 715 F.3d 328, 327 (11th Cir. 2013). And third, a court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).

### A. The Court is barred from granting release because Agomuoh has not exhausted his administrative remedies.

Agomuoh claims that the Court has authority to proceed on his request for compassionate release despite not exhausting his administrative remedies. This is simply not correct. The compassionate-release statute's exhaustion requirement in 18 U.S.C. § 3852(c)(1)(A) is mandatory. Agomuoh did not comply with it, and his motion should be overruled on that basis alone.

Outside of a few narrow exceptions, section 3582(c) strongly prohibits a defendant's sentence from being modified after it has been imposed. 18 U.S.C. § 3582(c) ("The court may not modify a term of imprisonment once it has been imposed . . ."). The Sixth Circuit has firmly enforced that prohibition. *United States v. Ross*, 245 F.3d 577, 585–86 (6th Cir. 2001).

One limited exception is the compassionate-release statute, 18 U.S.C. § 3582(c)(1)(A). But § 3582(c)(1)(A) prohibits a defendant from moving for compassionate release, and the court from acting on that motion, until after the defendant has satisfied the statute's exhaustion requirement. This requirement demands that before a defendant moves

for compassionate release in court, he "must at least ask the Bureau of Prisons to do so on [his] behalf and give BOP thirty days to respond." *United States v. Raia*, ___ F.3d ___, No. 20-1033, 2020 WL 1647922, at *1 (3d Cir. Apr. 2, 2020); 18 U.S.C. § 3582(c)(1)(A).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1855–57 (2016). Those requirements may not be excused, even to account for "special circumstances." *Id.*; *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Rather, as a judge in this district recently held, "[t]he text of 18 U.S.C. § 3582(c) defines mandatory conditions precedent to a defendant filing a motion [for compassionate release] under that section." *United States v. Alam*, No. 15-20351, at 4 (E.D. Mich. Apr. 8, 2020); *see also* Gov't Br. on Appeal, *United States v. Alam*, 6th Cir. No. 20-1298 (filed Apr. 16, 2020); *United States v. Mathews*, 2020 WL 1873360 (E.D. Mich. Apr. 15, 2020).

This requirement not only is a statutory mandate, but also gives the Bureau of Prisons a chance to review a defendant's request in the first instance. The Bureau of Prisons' review can result in the request being "resolved much more quickly and economically . . . than in

litigation in federal court." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). And it permits the Bureau of Prisons to gather the defendant's administrative and medical records, helping to "produce a useful"—and, here, necessary—"record for subsequent judicial consideration." *Id.*

The Third Circuit recently denied a similar, unexhausted motion for compassionate release, holding that the COVID-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s mandatory exhaustion requirement. *United States v. Raia*, ___ F.3d ___, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020). The Third Circuit explained that "[g]iven Bureau of Prisons' shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.*

Courts throughout the country have emphasized the importance of exhausting administrative remedies in the wake of the COVID-19 pandemic and have concluded that a district court cannot entertain a defendant's motion for compassionate release unless a defendant has exhausted his administrative remedies. *See, e.g.*, *Raia*, 2020 WL 1647922, at *2; *United States v. Rabadi*, 2020 WL 1862640, at *3

(S.D.N.Y. Apr. 14, 2020) (collecting numerous cases in which "courts have regularly held that statutory exhaustion requirements, such as those in Section 3582(c), must be 'strictly' enforced"); *United States v. Epstein*, 2020 WL 1808616, *4 (D.N.J. Apr. 9, 2020) (collecting cases and stating that "a majority of district courts across the country" have held that the Court does not have the authority to excuse a defendant's failure to exhaust his administrative remedies).

While the "vast majority" of district courts have enforced Congress's mandatory exhaustion requirement, *Rabadi*, 2020 WL 1862640, at *3, some have ignored it and invented their own exceptions. A commonly cited decision among courts in the latter camp is *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020), which Agomuoh also relies on his motion. But this Court should not follow *Perez* because it is "unpersuasive" and "unsupported by law." *United States v. Holden*, 2020 WL 1673440, *9 (D. Ore. Apr. 6, 2020). The "fundamental flaw" in *Perez* is that it relied on a decision from the Second Circuit that "dealt only with a judicially created exhaustion requirement, not a statutory one." *Epstein*, 2020 WL 1808616, *4 n.4; *see also United States v. Demaria*, 2020 WL 1888910, *3-4 (S.D.N.Y.

Apr. 16, 2020). This distinction is critical because, as the Supreme Court has explained, only "judge-made exhaustion doctrines . . . remain amendable to judge-made exceptions." *Ross*, 136 S. Ct. at 1857. A "statutory exhaustion provision stands on a different footing," because there "Congress sets the rules." *Id.* The Sixth Circuit has made the same point, noting the "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal*, 937 F.3d at 751. For statutory exhaustion requirements, "courts have 'refused to add unwritten' exceptions" into the text. *Id.* (quoting *Ross*, 136 S. Ct. at 1857). The same distinction applies here.

> **B.      There are no extraordinary and compelling reasons to grant Agomuoh compassionate release.**

Even if Agomuoh had exhausted his administrative remedies, compassionate release would be improper. The First Step Act did not change the substantive requirement that compassionate release be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020). Nor did Congress remove the directive that the Commission, not the judiciary, adopt the policies regarding "what should be considered extraordinary

and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C) & (t).

In that sense, the compassionate-release standard mirrors the identically-worded standard for sentence reductions under 18 U.S.C. § 3582(c)(2) based on retroactive guideline amendments. In both contexts, the Sentencing Commission's policy statements place "hard limit[s] on a court's ability to reduce the sentence." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). And the Supreme Court has upheld those limits under § 3582(c)(2), stressing that "Congress charged the Commission with determining in what circumstances and by what amount the sentences of prisoners affected by Guidelines amendments may be reduced." *Dillon v. United States*, 560 U.S. 817, 830 (2010). So even when an inmate asks a district court to disregard those limits, the Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *Jackson*, 751 F.3d at 711; *accord United States v. Horn*, 612 F.3d 524, 527–28 (6th Cir. 2010).

For compassionate release, the Sentencing Commission has fulfilled Congress's directive in its policy statement in USSG § 1B1.13. That policy statement limits "extraordinary and compelling reasons" to

four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons." USSG § 1B1.13 cmt. n.1. Unless an inmate's circumstances fall within those categories, he is not eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A); *Saldana*, 2020 WL 1486892, at *3; *cf. Dillon*, 560 U.S. at 830.

Agomuoh relies on his medical conditions in seeking release, but he is not eligible for compassionate release on that basis. Agomuoh's conditions are not terminal, and every indication is that his health is stable. None of his conditions are so severe that they "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *See* USSG § 1B1.13 cmt. n.1.

Nor is Agomuoh correct in suggesting that the COVID-19 pandemic should alter this analysis here. The crux of Agomuoh's claim is a generalized assertion that he *could* contract COVID-19 and that the virus *could* jeopardize his health, and that the risk of those things happening in prison is greater than the risk of them happening on

release. But Agoumoh sidesteps several important considerations in that analysis.

First, Agomuoh ignores or minimizes the efforts taken by BOP to suppress the spread of COVID-19 into and within its facilities. He points to circumstances at institutions, such as the local jail on Riker's Island, or ICE detention facilities – where new inmates are in and out of the facility on a daily basis, and conditions are typically crowded – and analogizes those circumstances to a very different institution like a federal prison facility. But BOP is making herculean efforts at [mitigating the impacts](#) of COVID-19. It is true that the quiet spread of the virus in March, and possibly earlier, prior to a full understanding of how widespread it could be and impact it could have, led to its infiltrating and spreading in some federal prison facilities, but many facilities' efforts at suppression have been successful. *See* [https://www.bop.gov/coronavirus/](https://www.bop.gov/coronavirus/). As of the date of this filing, there are no confirmed cases in FCI Morgantown where Agomuoh is incarcerated.

Second, Agomuoh ignores the possibility that he would *still* contract COVID-19, even if released. COVID-19 will continue to be widespread among the public for many more months, and possibly for

years. And the southeast Michigan area to which Agomuoh would presumably return is one of the hotbeds of community spread in the country. *See, e.g.*, https://www.reuters.com/article/us-health-coronavirus-usa-detroit-idUSKCN22A32R ("COVID-19 testing for anyone draws a crowd in hard-hit Detroit," Reuters, April 28, 2020"),. Agomuoh ignores, too, that medical care for the various ailments of which he complains may become harder in the Detroit area as hospital systems struggle with all of the redirection of efforts to addressing COVID-19 infections. *See* https://www.michiganradio.org/post/beaumont-hospitals-announce-layoffs-and-job-cuts-because-covid-19-related-revenue-losses.

Nor is Agomuoh eligible for compassionate release based on the "other reasons" category. For this category, the Bureau of Prisons has issued Program Statement 5050.50, which contains standards for eligibility that are related to but somewhat more extensive than the first three categories. Agomuoh has not shown that he satisfies those standards.

Further, because Congress and the Sentencing Commission have mandated that "other reasons" for eligibility be determined by the

Bureau of Prisons, not the judiciary, the Court lacks the authority to grant compassionate release based solely on the general threat posed by the COVID-19 pandemic. *See United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020); *United States v. Lynn*, 2019 WL 3805349, at *4-5 (S.D. Ala. Aug. 13, 2019); *United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. 2019); *United States v. Washington*, 2019 WL 6220984, at *2 (E.D. Ky. Nov. 21, 2019); *United States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019); *United States v. Ebbers*, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Overcash*, 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019); *United States v. York*, 2019 WL 3241166, at *4 (E.D. Tenn. July 18, 2019).

Even if that judicial authority existed, the COVID-19 pandemic does not qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate

release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." Raia, __ F.3d __, No. 20-1033, at 8. The Bureau of Prisons has worked around the clock to implement precautionary measures reducing the risk from COVID-19 to Agomuoh and other inmates. And if COVID-19, standing alone, qualified as an "extraordinary and compelling reason" for relief, there would be no limiting principle: *every* inmate—no matter his actual risk of contracting COVID-19 in prison, no matter his risk of contracting COVID-19 if released, and no matter his risk of developing complications from COVID-19, either in prison or on release—would be presumptively entitled to relief under § 3582(c)(1)(A). Nothing in the statute or USSG § 1B1.13 supports such an unbounded interpretation. *See* Raia, __ F.3d __, No. 20-1033, at 8. Agomuoh is not eligible for compassionate release.

## Conclusion

Agomuoh's motion should be denied.

                                                 Respectfully submitted,

                                                 MATTHEW SCHNEIDER
                                                 United States Attorney

                                                 <u>s/ Brant Cook</u>
                                                 Assistant U.S. Attorney
                                                 211 West Fort Street, Suite 2001
                                                 Detroit, MI  48226
                                                 (313) 226-9756
                                                 brant.cook@usdoj.gov

Dated: May 1, 2020

**Certificate of Service**

I certify that on May 1, 2020, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to all users of record.

s/ Brant Cook<br>
Assistant U.S. Attorney