# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

United States of America,

                    Plaintiff,      Case No. 16-20196

v.                             Judith E. Levy
                                 United States District Judge

Obioma Agomuoh,        R. Steven Whalen
                                 Magistrate Judge

                   Defendant.

_____/

## CORRECTED[1] ORDER GRANTING DEFENDANT OBIOMA AGOMUOH'S MOTION FOR COMPASSIONATE RELEASE [86]

Defendant Obioma Agomuoh moves for compassionate release and/or reduction of his criminal sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

For the following reasons, the Court GRANTS Defendant's motion.

## FACTUAL BACKGROUND

1. Defendant's Background and Criminal History

Defendant Obioma Agomuoh is 69 years old. He suffers from the following chronic health conditions: hyperlipidemia, hypertensive heart

---

[1] Amending language and a numerical inconsistency in the relief section.

disease without failure, atherosclerotic heart disease, diabetes, bilateral osteoarthritis, and glaucoma. (ECF No. 86, PageID.855.) According to Defendant's medical records, which are current as of March 2020, Defendant is taking the following medications: aspirin, atorvastatin, diltiazem HC1, hydrochlorothiazide, lisinopril, metformin, and metoprolol tartrate. (ECF No. 90, PageID.908.) When the Court sentenced Defendant in January 2019, the Court recommended that he be placed at a medical facility due to the breadth and severity of his underlying health conditions. (ECF No. 74, PageID.779.)

Defendant is currently serving a 60-month sentence at FCI Morgantown in Morgantown, West Virginia, to be followed by three years of supervised release. (*Id.*) In February 2018, Defendant plead guilty to one count of Healthcare Fraud, in violation of 18 U.S.C. § 1347, and one count of Conspiracy to Unlawfully Distribute Controlled Substances, in violation of 21 U.S.C. § 846. (*Id.* at PageID.778.) From approximately 2011 through 2015, Defendant defrauded Medicare out of $ 1.6 million by knowingly billing for numerous medical services that he had not in fact provided. (ECF No. 61, PageID.557.) During this time, Defendant also

2

unlawfully distributed numerous controlled substances for personal profit, including oxycodone. (*Id.*)

As of May 2020, Defendant has served 9 months out of his 60-month sentence at FCI Morgantown. The parties agree that Defendant has not had disciplinary issues while incarcerated.

2. The COVID-19 Pandemic

On March 13, 2020, the President of the United States declared a national emergency due to the novel coronavirus disease (COVID-19). *Proclamation on Declaring a national Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (Mar. 13, 2020) https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. On March 22, 2020, the Governor of Michigan explained that COVID-19 "is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine or antiviral treatment for this disease." Executive Order, No. 2020-20 (Mar. 22, 2020). In West Virginia, where Defendant resides at FCI Morgantown, the Governor issued a

"stay-at-home" order on March 24, 2020, and recently modified it to a "safer-at-home" order "[t]o preserve public health and safety, and to ensure the healthcare system in West Virginia remains capable of serving all citizens in need." Executive Order, No. 32-20 (Apr. 30, 2020). The Centers for Disease Control and Prevention (CDC) has warned that a case of COVID-19 could be particularly dangerous for individuals over the age of 65 and individuals with diabetes and heart conditions. *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. Defendant Agomuoh falls into all three of these categories. (ECF No. 86.)

Since the Court sentenced Defendant in 2019, the exceptionally dangerous nature of the COVID-19 pandemic has become apparent. As of May 18, 2020, there are now 1,490 confirmed cases of COVID-19 in the state of West Virginia, where Defendant resides in federal custody, and 67 known related deaths. *See West Virginia Coronavirus Disease*, West Virginia Department of Health and Human Resources, https://dhhr.wv.gov/COVID-19/Pages/default.aspx. COVID-19 has a high risk of transmission, and the number and rate of confirmed cases indicate

broad community spread. *See id.* Nationally, Bureau of Prison (BOP) detention facilities across the country are experiencing similar trends. As of May 18, 2020, BOP has confirmed at least 2,319 cases of COVID-19 among federal inmates and 284 cases among detention facility employees and personnel. *COVID-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/.

3. Conditions at FCI Morgantown

On March 23, 2020, the CDC acknowledged that correctional and detention facilities "present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. Specifically, the CDC noted that many detention conditions create a heightened risk of danger to detainees. These include low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of

5

incarcerated/detained persons to exercise effective disease prevention measures (*e.g.*, social distancing and frequent handwashing). *Id.*

The CDC recommended that all correctional facilities take preventative measures, including: ensuring an adequate supply of hygiene and medical supplies, allowing for alcohol-based sanitizer throughout facilities, providing no-cost soap to all inmates for frequent handwashing, cleaning and disinfecting frequently touched surfaces several times per day, performing pre-intake screening and temperature checks for all new entrants, increasing space between all detained persons to at least six feet, staggering meals, and having healthcare staff perform regular rounds. *Id.* In its response, the United States argues that FCI Morgantown has taken "herculean" measures to "mitigate[] the impacts of COVID-19." (ECF No. 93, PageID.933.) Though the United States does not describe these measures, the Bureau of Prison website notes that its prisons have implemented the following steps: screening all newly-arriving detainees for COVID-19 risk factors and symptoms; quarantining all newly-arriving detainees for 14 days; isolating all symptomatic detainees; providing onsite medical care; enhancing the screening of BOP staff; suspending social and legal visits; and modifying

programs and operations for detainees to assist with social-distancing efforts. *BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp.

Assuming FCI Morgantown has implemented the measures listed on BOP's website, the Court commends it for following the CDC's guidelines. However, Defendant's description of his confinement conditions suggests that many important recommendations remain unimplemented. At the May 7, 2020 hearing on this motion, Defendant described his living conditions in this way:

> Mr. Agomuoh has been transferred within the prison and now has a new roommate. They're sleeping within ten feet of each other. They're eating elbow to elbow . . . . There's no medical treatment after 5:00 PM. He would have to wait until the next day. There's usually—he reports only one doctor on staff with a handful of nurses for the population of I believe almost 700.

(Tr. Pgs. 5-6.) The United States did not dispute this description of current conditions at FCI Morgantown.

There are currently no confirmed cases of COVID-19 at FCI Morgantown, though it is not clear whether the facility is conducting widespread COVID-19 tests for inmates or staff. Regardless, Defendant argues that his conditions of confinement, coupled with his age and

underlying medical conditions, place him at an increased risk of severe illness and death from a COVID-19 infection in FCI Morgantown.

## LAW AND ANALYSIS

Defendant seeks compassionate release and reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The relevant provision provides:

> (c) The court may not modify a term of imprisonment once it has been imposed except that—
>
>> (1) in any case—
>>
>>> (A) the court, upon motion of . . . the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section § 3553(a) to the extent that they are applicable, if it finds that—
>>>
>>>> i) extraordinary and compelling reasons warrant such a reduction.

*Id.*

There are two key questions of law in compassionate release cases. The first is whether a defendant satisfies the statutory requirement to

either "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or wait 30 days "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* The second is whether extraordinary and compelling reasons, as well as the defendant's own history and characteristics, warrant a reduction of the defendant's sentence. *Id.* For the reasons below, the Court waives the statutory exhaustion requirement and finds that Defendant has demonstrated extraordinary and compelling reasons for immediate release.

### 1. Threshold Exhaustion Requirement[2]

---

[2] Though the United States did not contest the Court's subject-matter jurisdiction over this case, the Court nevertheless concludes that the statutory exhaustion requirement is not a jurisdictional bar to review. In 2019, the Supreme Court found that a similar statutory exhaustion scheme in Title VII was a "prerequisite to suit" that was not jurisdictional, but rather "properly ranked among the array of claim-processing rules." *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1843 (2019). Noting that the Supreme Court has undertaken "[t]o ward off profligate use of the term ['jurisdiction']," the Court held that a statutory prescription may become jurisdictional in one of two circumstances: 1) when Congress explicitly incorporates a requirement into a jurisdictional provision of the statute; or when 2) "A long line of Supreme Court decisions left undisturbed by Congress attache[s] a jurisdictional label to the prescription." *Id.* (internal citations omitted).

18 U.S.C. § 3582(c)(1)(A) falls into neither of these categories, and is therefore a claim-processing rule rather than a jurisdictional requirement. § 3582(c)(1)(A) is not in the jurisdictional section of the "crimes and criminal procedure" statutes, but

Defendant submitted his administrative request for compassionate release to FCI Morgantown on Friday, May 1, and has not yet received a response from BOP. Defendant has therefore failed to either exhaust his administrative remedies or to wait 30 days from the warden's receipt of his petition, as required by statute before bringing a compassionate release motion to the Court. § 3582(c)(1)(A).

Defendant argues that that, under the exigent circumstances of COVID-19, "requiring the 30-day period to pass before Mr. Agomuoh could seek relief from the Court would be futile and [would] only further endanger Mr. Agomuoh's health." (ECF No. 86, PageID.860.) Conversely, the United States argues that Defendant's failure to fulfil this preliminary statutory requirement bars the Court from considering the merits of his position. (ECF No. 93, PageID.926.) Citing the 2016 Supreme Court case *Ross v. Blake*, the United States argues that "[s]tatutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. Those requirements may not be excused, even to account for 'special circumstances.'" (*Id.* at PageID.927 (internal citations omitted).)

---

is instead located in the section addressing sentencing. Additionally, there are no Supreme Court cases attaching a jurisdictional label to §3582(c)(1)(A).

The United States argues that courts must afford statutory exhaustion requirements great deference, and that any judge-made exception to the § 3582(c) exhaustion requirement is barred by the Supreme Court's holding that "mandatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion." (*Id.*, citing *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).)

Since the outbreak of the COVID-19 pandemic, courts around the country have wrestled with the question of whether a judge may waive the § 3582(c) statutory exhaustion requirement and reach the merits of an untimely petition for compassionate release. Within the Eastern District of Michigan alone, judges have reached divergent, good-faith conclusions about this difficult interpretive question. *See, e.g.*, *United States v. Reddy*, No. 13-20358, 2020 WL 2320093, at *4 (E.D. Mich. May 11, 2020) (reaching the merits because "the purposes of the exhaustion requirement have been satisfied" and because "excusing strict exhaustion . . . during the COVID-19 pandemic is consistent with the congressional intent underlying the exhaustion requirement"); *United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *3 (E.D. Mich. Apr. 20, 2020) (reaching the merits because of the "once-in-a-lifetime circumstances of

11

COVID-19 and the personal characteristics of [the defendant] . . . it would respect Congress' intent in placing a 30-day clock on the Warden to act, to allow [the] motion to be heard now"); *United States v. Mathews*, No. 14-20427, 2020 WL 1873360, at *2 (E.D. Mich. Apr. 15, 2020) (declining to reach the merits because "[t]he statute does not contain the type of exception contemplated by Defendant. Granting such an exception would rob the BOP of the opportunity to address Defendant's request"); *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2 (E.D. Mich. Apr. 8, 2020) (declining to reach the merits because "courts have  a role in creating exceptions only if Congress wants them to . . . even if an exception to 18 U.S.C. § 3582(c)(1)(A)'s filing requirements for defendants is appropriate during the COVID-19 pandemic, the Court lacks authority to craft such an exception").

The United States urges this Court to adopt the position, as did the Honorable Sean F. Cox in *Alam* and other judges around the country, that the Supreme Court foreclosed judge-made waivers of statutory exhaustion requirements in its 2016 decision *Ross v. Blake*. (*See* ECF No. 93, PageID.927.) In *Ross*, the Court concluded that judges may not excuse an inmate's failure to exhaust administrative remedies prior to bringing

suit under the Prison Litigation Reform Act (PLRA), even under "special circumstances." 136 S. Ct. at 1856-57. Specifically, the Court held the following:

> [T]he PLRA's text suggests no limit on an inmate's obligation to exhaust—irrespective of any "special circumstances." And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.

*Id.* (internal citations omitted).

The Court agrees with the United States that this language, read in isolation, could be interpreted to prohibit judicial waivers of statutory exhaustion provisions. However, no language should be read in isolation of its context. In reaching the conclusion above, the *Ross* Court meticulously tailored its analysis to the statutory language and congressional history *of the PLRA*, and limited its holding accordingly: "Of course, an exhaustion provision with a different text and history from [the PLRA] might be best read to give judges the leeway to create

13

exceptions or to itself incorporate standard administrative-law exceptions. The question in all cases is one of statutory construction, which must be resolved using ordinary interpretive techniques."[3] *Id.* at 1858 n.2.

In reaching its conclusion that Congress did not intend for judicial waiver of the PLRA exhaustion requirement, the Supreme Court analyzed the PLRA's language and congressional history. *Id.* at 1856-58. Applying these "ordinary interpretive techniques," the *Ross* Court concluded that the PLRA's "mandatory language," as well as a recent congressional amendment intended to limit prisoner lawsuits, both "underscore[d] the mandatory nature of [the PLRA] exhaustion regime." *Id.* However, neither the text of the compassionate release statute, nor its Congressional history, warrant the same conclusion. To the contrary,

---

[3] Recent Supreme Court precedent strongly supports the conclusion that the *Ross* Court did not intend to completely foreclose judicial waivers of statutory exhaustion requirements. In 2019, the Court released an opinion discussing the difference between jurisdictional statutory exhaustion requirements and "claims processing rules" such as the exhaustion requirement at issue here. *See supra n.2* (citing *Fort Bend Cty. v. Davis*, 139 U.S. 1843, 1849 (2019)). In *Davis*, rather than reiterate what the United States argues is *Ross*'s absolute ban on judge-made waivers, the Court instead "reserved whether mandatory claim-processing rules may [ever] be subject to equitable exceptions." *Davis*, 139 U.S. at 1849. Thus, it is still an open question whether the compassionate release statute's claim-processing rule may be subject to equitable exceptions.

14

as set forth below, both the text and history of § 3582(c)(1)(A) strongly indicate that Congress intended for the compassionate release provision to provide vulnerable inmates with speedy access to judicial relief in times of emergency.

A. The Text of § 3582(c)(1)(A)

"Statutory interpretation, as we always say, begins with the text." *Ross*, 136 S. Ct. at 1856. The PLRA provision at issue in *Ross* reads as follows: "No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). As the Supreme Court emphasized, this command is framed in mandatory "shall" terms, and "the PLRA's text suggests no limits on an inmate's obligation to exhaust." *Ross*, 136 S. Ct. at 1856.

Conversely, the compassionate release statute reads as follows: "[T]he court, upon motion of . . . the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's

15

facility, whichever is earlier, may reduce the term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). Unlike the PLRA, the compassionate release statute provides a prisoner with a choice: *either* exhaust all BOP administrative remedies *or* wait 30 days after notifying the warden. As the Honorable Jed. S. Rakoff held in *United States v. Haney*,

> That the statute gives the defendant this choice is crucial . . . . Generally, Congress imposes exhaustion requirements in order to serve the twin purposes of protecting administrative agency authority and promoting judicial efficiency. But the hybrid requirement in this statute—either exhaust or wait 30 days—substantially reduces the importance of the first purpose, as it allows a defendant to come to court before the agency has rendered a final decision. Indeed, anyone familiar with the multiple demands that the BOP has faced for many years in this era of mass incarceration can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial.

No. 19-541, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020). The text of the statute further underscores the urgent nature of the intended relief by emphasizing that defendants can chose "whichever [path] is earlier." § 3582(c)(1)(A). Indeed, though 30 days can make the difference between life and death during this pandemic, it is remarkable that Congress gave BOP such a short period of time in which to process an application and all related appeals. By way of comparison, 30 days is half the time that

Congress gave the United States to decide whether to appeal a civil case, Fed. R. Civ. App. P. 4(a)(1)(B), and far fewer than the 180 days that Congress gave the United States to act on an Equal Employment Opportunity Commission charge. 42 U.S.C. § 2000e-5(f)(1); 29 C.F.R. § 1601.28(a)(1).

In short, the Court reads the 30-day language to bind the *government*, not the defendant. If BOP wishes to contribute to the decisions regarding Defendant's compassionate release, it must do so within 30 days of receiving Defendant's request. § 3582(c)(1)(A). Otherwise, the statute permits Defendant to seek quick judicial relief. *Id.* Because the text of § 3582(c)(1)(A) gives defendants such an option, it does not speak in the same absolute, mandatory terms as does the PLRA. And because the text binds the United States with an unusually tight timeline that does not ultimately require any BOP input should defendants choose to exhaust rather than appeal, the Court concludes that the text of the compassionate release statute does not contain a "mandatory exhaustion regime" that forecloses judicial waiver. *Cf. Ross*, 136 S. Ct. at 1857.

B. The Congressional History of § 3582(c)(1)(A)

17

In determining that "the history of the PLRA underscores the mandatory nature of its exhaustion regime," the *Ross* Court contrasted the PLRA's current, absolute exhaustion requirement with its previous incarnation, a "weak exhaustion provision" in the Civil Rights of Institutionalized Persons Act (CRIPA) that required exhaustion "only if a State provided plain, speedy, and effective remedies meeting federal minimum standards—and even then, only if the court believed exhaustion appropriate and in the interests of justice." *Id.* at 1858 (internal quotations omitted). This prior statutory scheme, the Court said, was "in large part discretionary," whereas the new PLRA strengthened the procedural exhaustion regime and operated to shrink prisoner access to judicial remedies. *Id.* The *Ross* Court took this congressional decision as powerful evidence that a mandatory PLRA exhaustion provision would honor congressional intent. *See id.* ("The PLRA's history (just like its text) thus refutes a 'special circumstances' exception to its rule of exhaustion. [Petitioner's suggested] approach, if applied broadly, would resurrect CRIPA's scheme.")

Unlike the PLRA, which Congress passed in part to restrict prisoner access to the courts, Congress recently amended the

compassionate release statute to *increase* prisoner access to courts. Prior to 2018, only the Director of the Bureau of Prisons could file a motion for compassionate release. *United States v. Davis*, No. 15-20067, 2019 WL 6898676, at *1 (W.D. Tenn. Dec. 18, 2019). Effective December 21, 2018, however, the First Step Act "amended 18 U.S.C. § 3582(c)(1)(A) to allow a prisoner to file a motion for compassionate release on his own behalf." *Id.* (citing Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239). Just as the Supreme Court gave great weight to Congress's restriction of prisoner rights when analyzing the PLRA's exhaustion regime, so too, here, the Court gives great weight to Congress's *expansion* of prisoner rights when analyzing the compassionate release statute. The Court honors congressional intent not by routinely enforcing the 30-day period in the face of a global pandemic, but instead by waiving such a requirement where appropriate and in accordance with Congress's clear attempt to afford quick judicial relief to vulnerable individuals.

Accordingly, careful analysis of § 3582(c)(1)(A)'s text and history leads to the conclusion that the compassionate release statute is "best read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law exceptions." *Ross*, 136 S. Ct. at 1858 n.2. As

written, the compassionate release statute incorporates the standard administrative-law exception of "undue prejudice." *See Satgunam v. Michigan State University*, 556 Fed. Appx. 456, 464 (6th Cir. 2014) (citing *McCarthy v. Madigan*, 503 U.S. 140, 146-47 (1992)). Traditionally, the "undue prejudice" exception applied when "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action." *Id.* Such prejudice may result, for example, from an "unreasonable or indefinite timeframe for administrative action." *McCarthy*, 540 U.S. at 146.

In the face of a global virus with no vaccine, no cure, and rapid, asymptomatic spread, 30 days is an unreasonable timeline for administrative action. Forcing Defendant to wait 30 days to bring his claim would cause him undue prejudice because his conditions of confinement render him unreasonably likely to contract COVID-19, and because his age, diabetes, and heart conditions render him unreasonably likely to face a dire outcome should he contract the disease. Accordingly, the Court waives Defendant's failure to either exhaust his administrative remedies or to wait 30 days. The Court will turn to the merits of Defendant's motion.

20

## 2. Compassionate Release

There are three components to a compassionate release merits analysis: 1) whether extraordinary and compelling reasons warrant a reduction in sentence, as described by the United States Sentencing Commission; 2) whether the § 3553(a) factors—"to the extent that they are applicable"—render the reduction inappropriate; and 3) whether Defendant would be a danger to the public. The Court finds that these three factors weigh in favor of immediate compassionate release of Defendant. The Court will address each factor in turn below.

A. Extraordinary and Compelling Circumstances

In defining "extraordinary and compelling circumstances," the compassionate release statute directs the Court to consider the United States Sentencing Guidelines. 18 U.S.C. §3582(c). United States Sentencing Guideline § 1B1.13 articulates that extraordinary and compelling circumstances exist in the following instances:

(A) Medical Condition of the Defendant.—
(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

21

(ii) The defendant is—

    (I) suffering from a serious physical or medical condition,

    (II) suffering from a serious functional or cognitive impairment, or

    (III) experiencing deteriorating physical or mental health because of the aging process,

    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* Here, Defendant argues that his underlying conditions—his age, diabetes, and heart conditions—place him at increased risk of severe illness and death from a COVID-19 infection, making the COVID-19 pandemic an extraordinary and compelling circumstance that justifies compassionate release. At oral argument, Defendant contended that his current conditions of confinement render it impossible for him to safely socially isolate, and that he is therefore unable to take the preventative steps necessary to protect himself from COVID-19. For these reasons, Defendant argues that his conditions of confinement at FCI Morgantown render him highly susceptible to COVID-19 infection, and that his medical conditions render him highly susceptible to a dire outcome from

such an infection. These factors jointly prevent him from providing self-care within the prison.

Conversely, the United States argues that "Aguomuoh's conditions are not terminal, and every indication is that his health is stable." (ECF No. 93, PageID.932 (citing U.S.S.G. § 1B1.13 cmt. n.1).) The United States argues that "the crux of Agomuoh's claim is a generalized assertion that he *could* contract COVID-19 and that the virus *could* jeopardize his health . . . [b]ut Agomuoh sidesteps . . . BOP['s] herculean efforts at mitigating the impacts of COVID-19." (*Id.* at PageID.932-933.) Finally, the United States argues that, in light of FCI Morgantown's lack of confirmed COVID-19 cases, Defendant "ignores the possibility that he would *still* contract COVID-19, even if released." (*Id.* at PageID.933.)

The Court first notes that it is irrelevant whether Defendant could contract COVID-19 outside of FCI Morgantown. The pertinent question is whether there is some product of Defendant's combined medical conditions and conditions of confinement that "substantially diminish" his ability to provide self-care "*within the environment of a correctional facility.*" U.S.S.G. § 1B1.13 (emphasis added). As the Honorable Terrence

G. Berg recently noted when presented with similar arguments pursuant

to the Bail Reform Act:

> Sadly, the Court of course must acknowledge the prevalence of [danger outside of prison. But t]hat reality should never be exploited, nor can it be accepted, as a reason for locking people up. Nor should the risk of such dangers be confused with legitimate justifications for detention . . . . . The health risks posed by the close quarters of confinement during a highly contagious respiratory pandemic, when combined with a particular inmate's vulnerability to consequence of the disease, are circumstances that the Court and the government can control. [But] the Court will not countenance the cynical and illogical position that a defendant is "safer in prison" as a reason to support detention.

*United States v. Sanders*, No. 19-20288, 2020 WL 2320094, at *8 (E.D.

Mich. May 11, 2020). Similarly, the Court will not now consider the

cynical argument that it must detain Defendant to protect him from

disease, other than to note that this argument is as ill supported by fact

as it is law. *COVID-19 Coronavirus*, Federal Bureau of Prisons,

https://www.bop.gov/coronavirus/ (noting that there are at least 2,319

BOP detainees with confirmed COVID-19 diagnoses and at least 56

detainee deaths).

As to FCI Morgantown's lack of confirmed COVID-19 cases, the

Court accords no weight to this statistic without evidence that FCI

Morgantown has implemented a universal testing regimen. *See United*

24

*States v. Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020) ("Zero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases. The Bureau of Prisons recently discovered this when it found that 70 percent of the inmates it tested were positive for the disease.") To the contrary, the lack of any confirmed testing at FCI Morgantown "aggravates [the Court's] concerns about Defendant's likelihood to contract COVID-19 while in federal custody." *Id*. As West Virginia lawmakers recently urged in a petition to the Bureau of Prisons, increased testing is necessary to contain the otherwise rapid and often asymptomatic spread of this disease. *See* Basil John, *West Virginia lawmakers press the Bureau of Prisons for more COVID-19 testing*, (May 14, 2020) https://www.wwlp.com/news/west-virginia-lawmakers-press-the-bureau-of-prisons-for-more-covid-19-testing/.

Accordingly, the Court finds that extraordinary and compelling circumstances warrant a reduction of Defendant's sentence. The current conditions of Defendant's confinement at FCI Morgantown, which Defendant has no power to alter, expose him to a substantial risk of contracting COVID-19. And Defendant's age and numerous medical conditions render him substantially likely to suffer a dire outcome should

he contract the virus. Together, these factors lead the Court to conclude that Defendant is suffering from a serious physical or medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [he] is not expected to recover." 18 U.S.C. § 3582(c)(1)(A)(i).

The Court sentenced Defendant to 60 months in prison; it did not sentence him to death or to incarceration that carries a significant risk of death. Defendant has demonstrated that extraordinary and compelling circumstances warrant compassionate release.

B. § 3553(a) Factors

The compassionate release statute directs courts to consider the § 3553(a) sentencing factors "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
**(B)** to afford adequate deterrence to criminal conduct;
**(C)** to protect the public from further crimes of the defendant; and
**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

26

(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
(5) any pertinent policy statement—
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

Careful consideration of these factors previously led the Court to impose a sentence of 60 months in prison. Using the same analysis, the Court will release Defendant from federal custody, but it will not restore Defendant's liberty until his sentence is completed. Defendant will serve a period of supervised release, including a period of home incarceration, equal to what would have been the remainder of his time at FCI Morgantown. Defendant will then serve the three-year term of supervised release that was part of his original sentence, without the home-incarceration condition.

### C. Danger to the Community

Sentencing guideline § 1B1.13 further specifies that a reduction in sentence is only appropriate if "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.

27

The Court finds that Defendant will not pose a danger to the community. Though the Court condemns Defendant's past conduct and his abuse of his position of trust in the medical field, this offense is unlikely to predict future dangerous behavior of the kind that would obviate compassionate release. Defendant has had no disciplinary issues while in prison. As the United States conceded during oral argument, any risk Defendant may pose to the community is low. (Tr. pg. 24.)

Accordingly, the Court finds that Defendant will not pose a danger to the public and that compassionate release is appropriate.

## RELIEF

The Court is aware that it does not have statutory authority to order that Defendant's current sentenced be modified to home confinement. *See, e.g.*, *United States v. Miller*, No. 16-20222, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020). Nor may the Court review BOP's internal confinement decision to deny compassionate release. *Crowe v. United States*, 430 Fed. Appx. 484 (6th Cir. 2011).

Therefore, the Court reduces Defendant's sentence to time served. The Court imposes a new term of supervised release of 87 months, of which the first 12 months shall be served in home incarceration. The next

39 months shall be served without the home-incarceration condition, but with location monitoring and a curfew, the details of which are to be determined by the Probation Department. The final 36 months shall be served according to the original conditions of Defendant's three-year supervised release term that the Court imposed upon Defendant during his January 2019 sentencing. Defendant's supervised release shall include electronic location monitoring, to commence as soon as the Probation Department can safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary.

**CONCLUSION**

Accordingly,

IT IS ORDERED that Defendant's Motion for Release from Custody (ECF No. 86) is GRANTED;

IT IS FURTHER ORDERED that Defendant's sentence of imprisonment is reduced to time served;

IT IS FURTHER ORDERED that BOP shall release Defendant immediately after holding him for a 14-day quarantine period at FCI Morgantown;

IT IS FUTHER ORDERED that, immediately upon release, Defendant shall commence a new term of supervised release of 87 months;

IT IS FURTHER ORDERED that Defendant shall serve the first 12 months of supervised release under home incarceration, with electronic location monitoring to commence as soon as the Probation Department can, upon its own determination, safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary;

IT IS FURTHER ORDERED that, after serving 12 months' home incarceration, Defendant will serve the next 39 months without the home-incarceration condition but on location monitoring with a curfew, the details of which shall be imposed by the Probation Department;

IT IS FURTHER ORDERED that Defendant's final 36 months shall be served according to the original conditions of Defendant's three-year supervised release term that the Court imposed on Defendant during his January 2019 sentencing;

IT IS FURTHER ORDERED that additional conditions will be included in the Court's amended judgment;

IT IS FURTHER ORDERED that this Order replaces the Court's

January 2019 designation of supervised release.

IT IS SO ORDERED.

Dated: May 18, 2020                    s/Judith E. Levy
Ann Arbor, Michigan                    JUDITH E. LEVY
                                       United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 18, 2020.

                                       s/William Barkholz
                                       WILLIAM BARKHOLZ
                                       Case Manager

31